IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

AVRIELLE ROTH,

    Plaintiff,

    v.

FRANCESCA'S COLLECTION, INC.,

    Defendant.

Case No. 16-2841-JAR

## MEMORANDUM AND ORDER

Plaintiff Avrielle Roth brings this action against her former employer, Francesca's Collection, Inc. ("Francesca's"), alleging that her termination from employment was retaliatory in violation of public policy after she complained of alleged violations of the Kansas Wage Payment Act ("KWPA"). This matter is before the Court on Francesca's Motion for Summary Judgment (Doc. 47) on Plaintiff's claim. For the reasons discussed in detail below, the Court denies Defendant's motion.

**I.    Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3] A fact is "material" if, under

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Harriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[8] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[9] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[10]

The facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[11] Rule 56(c)(4) provides that opposing affidavits must be

---

[4]*Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8]*Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324; *Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

[9]*Anderson*, 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671); *see Kannady*, 590 F.3d at 1169.

[11]*Adams*, 233 F.3d at 1246.

made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14] In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.     Uncontroverted Facts

The following material facts are uncontroverted, stipulated to for the purposes of summary judgment, or viewed in the light most favorable to Plaintiff.

Roth started her employment with Francesca's in October 2014, as the Boutique Manager of Francesca's Oak Park Mall location in Overland Park, Kansas ("the Boutique"). Roth was a salaried, at-will employee. While employed with Francesca's, Sue Newsom was Roth's Regional Director and Ashley Russell was her District Manager. On October 10, 2014, Roth signed a Field Book Acknowledgment in which she acknowledged receipt of Francesca's Employee Handbook and agreed to abide by all policies and procedures set forth in the Handbook.[16]

---

[12]Fed. R. Civ. P. 56(c)(4).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[16]Roth objects to the foundation and authenticity of this exhibit because when presented with the handbook as an exhibit during her deposition, she testified she did not specifically recall the document or filling it out. Francesca's attaches the handbook as Ex. 4 and files a business records affidavit, Doc. 48, attaching signature page

### *Roth's Training/Onboarding Process*

"Onboarding" is the process by which new Boutique employees and their Boutique Managers must complete various new hire paperwork. Francesca's New Hire Paperwork & Set Up policy states that "[i]t is the Boutique Manager's responsibility to ensure new hire paperwork is completed per guidelines. All guidelines can be found for each individual state on the francesca's® Intranet."[17] Until a new hire has completed the onboarding process, he or she will not be entered into the payroll system or receive a login to electronically clock in and out. Francesca's New Hire Paperwork & Set Up policy also states, "[f]ailure to complete new hire forms accurately can result in problems with new Team member's pay."[18]

In November and December 2014, Francesca's Human Resources ("HR") personnel became aware that several of the employees at the Boutique had not completed the onboarding process and therefore, had not been entered into the payroll system. As of December 2, 2014, seven of the Boutique's employees had not completed the onboarding process. Francesca's HR Coordinator, Patricia Merlos, offered to help Roth complete the onboarding process for the employees and worked with Roth to complete the onboarding process for the Boutique's employees so the employees could be entered in the payroll system and be paid. Several of the employees' onboarding paperwork was incomplete in part because Roth failed to complete the required section of the employee's I-9 form. In addition, District Manager Russell reached out to Roth regarding the status of the onboarding process and offered her assistance. Russell showed Roth how to complete the missing onboarding information. Roth testified that she did not feel

---

from the handbook kept in Roth's personnel file. Accordingly, the exhibit is a record regularly kept in the course of business and is admissible pursuant to Fed. R. Evid. 803(6)(B).

[17]Doc. 49, Ex. 6.

[18]*Id.*, Ex. 5.

4

fully or properly trained in the process of completing new hire paperwork, and voiced complaints about her lack of training.

Roth hired several new employees at some point around the start of the Black Friday holiday shopping season in 2014. Roth testified that although her notes from that time period indicate that the employees could not start work until their paperwork was completed, Russell told her to "push them through, we'll worry about the paperwork later."[19] Because the onboarding process for the Boutique's employees was not completed, and the employees were thus not able to electronically clock in or clock out, Roth submitted manual timecards for the employees on December 7, 2014. The December 7 timesheets lacked employee numbers and one time sheet was not signed.

On December 21, 2014, Roth sent an email to Natalie Hannah, an employee in Francesca's HR department, asking for paychecks for the time period of November 23 through December 20, 2014, for employees Beverly Knox, Rosette Wertz, and KaytAnne Carpenter.[20] Although the onboarding process was not complete and the employees were unable to electronically clock in or clock out, payroll cards were issued to Knox, Wertz, and Carpenter on December 22, 2014. The payroll cards for these employees were sent to Francesca's HR department so their payroll funds could be loaded onto the cards. On December 24, 2014, Hannah confirmed that a paycheck had been mailed to Knox on December 19, 2014.[21]

### *Roth's Complaints that Employees had not been Paid*

Roth complained of unpaid wages for three of her employees: Knox, Wertz, and Carpenter. Russell recalls that she believes Roth reported to her, before December 21, 2014, that

---

[19]Doc. 55, Ex. 1 at 95:11–20, 96:2–14.

[20]Doc. 49, Ex. 17.

[21]*Id.*, Ex. 19.

Wertz and Knox did not receive paychecks when they were supposed to be paid.

Newsom testified that Roth repeatedly complained about Knox, Wertz, and Carpenter not being paid in a timely manner, and specifically recalled that Roth called her on December 24, 2014, to complain that Wertz had not been paid. Newsom also recalled that Roth called Francesca's corporate office with concerns about employees not being paid, and that the corporate office had to repeatedly call Roth to get her to complete the necessary paperwork for her employees. Newsom noted that "people at corporate really did not like taking her calls because she was so hostile."[22]

Natalie Hannah in HR testified that Roth complained to her about employees in her Boutique not being paid. Hannah testified about the December 21, 2014 email Roth sent complaining that Wertz and Carpenter had been working for one month without pay and were threatening to quit. Hannah then brought Roth's complaints to the attention of Russell and Newsom.

Roth testified that Newsom visited the Boutique on or about February 12, 2015. Roth testified that she again complained to Newsom at that time about employees not being fully compensated.

*Timecard Audit*

Following her store visit in February, Newsom asked Hannah to run a time card audit for the Boutique, which Hannah emailed to Newsom on February 18, 2015. Newsom then sent the audit report to Russell. Newsom could not recall what led to her request for an audit. When Hannah emailed the audit report to Newsom, she wrote, "I . . . do see where Avrielle is editing

---

[22]Doc. 55, Ex. 3 at 36: 9–23.

6

time. If you want to call me, I can walk you through the report."[23] Hannah testified that it was possible that Newsom may have requested the audit because she believed Roth may have made some edits to her time.

Russell testified that the time card audit came about because she was visiting Roth's Boutique when she overheard an employee who was returning from break say, "oh, I'll just clock in from my phone" when the register that was normally used for clocking in was occupied by a transaction.[24] Russell testified that she became concerned that employees were not utilizing the electronic timeclock system correctly, so she discussed the matter with Newsom. Russell testified that she was not aware of whether Roth ever clocked in on her phone.

The time card audit was conducted on February 18, 2015, and included information regarding six Boutique employees in addition to Roth.[25] The time card audit for the time period January 20 through February 18, 2015, revealed that Roth edited her own time on eight occasions. The audit further revealed that during that time period, Roth submitted her time edits in accordance with Francesca's policy to her District Manager, Russell, on three occasions for Russell to make the edits instead of Roth. Russell testified the only thing she recalls discussing with Newsom about the audit report is the edits Roth made to her time card rather than employees clocking in or out on their phones. Russell was not aware that any employees in the Boutique were disciplined for clocking in our out on their phones as a result of the audit.

Francesca's Time and Attendance policy states: "Boutique managers are to submit their missed punches to their District Managers for Correction."[26] The Time and Attendance and

---

[23]*Id.,* Ex. 4 at 50:11–51:5; Ex. 13.

[24]Doc. 49, Ex. 15 at 66:3–8.

[25]*Id.*, Ex. 20.

[26]*Id.*, Ex. 21.

Time Reporting policies, in a subheading titled "Altering Time Records," each state that "[a]ltering, falsifying, tampering with records, or recording time on another employee's time record may result in disciplinary action, up to and including termination of employment."[27] These policies applied to Roth, and she was aware of these policies.

As Boutique Manager, if Roth needed to make any changes to her time entries, Francesca's policy required her to submit her edits to District Manager Russell. If Roth did not clock in correctly, she would edit her time entries, sometimes more than twice a week. Roth testified that Russell told her she could edit her own time, which Russell denies. Russell did not recall ever questioning the hours Roth reported she worked.

### *Roth's Termination*

Francesca's terminated Roth's employment on February 26, 2015. Russell was present at the Boutique and Newsom was present on the phone. During the meeting, Newsom brought up the topic of compensation allegedly owed to Rosette Wertz, and Roth confirmed her belief that Wertz was still owed compensation for hours worked. Roth also confirmed Wertz's mother also believed her daughter was still missing a paycheck. Newsom assured Roth that Wertz had been paid despite Roth's beliefs.

That day, Roth's time cards indicated Roth had edited her time. Roth confirmed to Newsom and Russell that she "change[d] the timecards," but explained that she had not done so in a dishonest manner. Roth also stated that she felt Newsom "did not like her because she speaks up and would not stand in line and follow orders."[28] Newsom and Russell informed Roth she was being terminated for editing her own time. Roth did not know about the time card audit

---

[27]*Id.*, Exs. 21, 22.

[28]Doc. 55, Ex. 2 at 83:5–8.

until the date of her termination, nor did anyone at Francesca's speak with her about the edits to her time cards prior to her termination.

Russell testified that no other reason was discussed for Roth's termination, nor was any form of lesser discipline for Roth discussed with her. In her written recap of the termination meeting, Russell states "The end. (Thankfully!)," which she explains reflected the way Roth "exited her employment with us, it was a pretty frustrating and uncomfortable ordeal."[29]

Francesca's identified Newsom as the decision-maker in Roth's termination.[30] Newsom testified that Hannah in HR provided her with the time card audit that showed Roth was editing her time entries in violation of Francesca's policies. Newsom testified that she did not have the authority to make the final decision on how to proceed with Roth without HR involvement, and that after she received the audit from Hannah, she contacted HR and the decision was made "as a company" to terminate Roth's employment.[31] Newsom testified the normal protocol would be for Hannah to consult Tricia Butler, Vice President of HR, then get back with Newsom to advise what course of action would be taken with respect to the employee. Newsom testified that in her experience, every situation where an employee modified their time resulted in termination. Newsom did not identify any specific employee who had been terminated for this reason, nor was she aware of whether such terminations were preceded by prior discipline.

Russell testified that she was not involved in the decision to terminate Roth, and believes that Newsom and Hannah made the termination decision. Hannah testified that she conducted the time card audit but was not involved in the decision to terminate Roth. Hannah does not have any specific recollection of any employee being terminated for editing timecards.

---

[29]*Id.* at 83:24–84:11.

[30]*Id.*, Ex. 11.

[31]*Id.*, Ex. 3 at 62:5–8.

**III.    Discussion**

Kansas courts recognize a cause of action for retaliatory discharge based on an employee's pursuit of a wage claim under the KWPA.[32]  In this case, Roth contends she was terminated in retaliation for complaining to Francesca's that the company did not timely pay three of the Boutique's employees: Wertz, Knox, and Carpenter.

Wrongful discharge claims under Kansas law are analyzed using the three-part framework established in *McDonnell Douglas v. Green*.[33]  Under this framework, the plaintiff has the initial burden of establishing a prima facie case that raises a rebuttable presumption of retaliatory intent.[34]  Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory justification for the discharge.[35]  Finally, if the defendant meets this burden, the burden shifts back to the plaintiff to "assert specific facts establishing a triable issue as to whether the employer's reason for discharge is a mere cover-up or pretext for retaliatory discharge."[36]

The parties dispute the evidentiary standard to be applied to wrongful discharge claims under Kansas common law.  Francesca's argues that the Court should apply a clear and convincing standard, while Roth argues that the Court should apply a preponderance of the evidence standard.  Under Kansas law, a retaliatory discharge claim must be established "by a preponderance of the evidence, but the evidence must be clear and convincing in nature."[37]  The

---

[32]*Campbell v. Husky Hogs, L.L.C.*, 255 P.3d 1, 7 (Kan. 2011).

[33]141 U.S. 792, 824 (1973); *see Balfour v. Medicalodges, Inc.*, No. 05-2086-KHV, 2006 WL 37620410, at *12 (D. Kan. Dec. 19, 2006) (citing *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002)).

[34]*Foster*, 293 F.3d at 1193.

[35]*Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1116 (10th Cir. 2001).

[36]*Foster*, 293 F.3d at 1194 (quoting *Braken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002)).

[37]*Ortega v. IBP, Inc.*, 874 P.2d 1188, 1198 (Kan. 1994).

Kansas Supreme Court has concluded that a plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."[38] Because a federal court evaluating state claims is guided by federal standards governing summary judgment procedure, the evidentiary standard that Kansas courts apply on summary judgment do not apply.[39] "[A] plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."[40] Plaintiff is not required, however, to establish the elements of his or her prima facie case by clear and convincing evidence.[41] The clear and convincing evidence standard applies once the burden shifts back to plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual.[42]

To state a prima facie case for retaliatory discharge based on whistleblowing, Roth must establish that (1) a reasonably prudent person would have concluded that Francesca's failed to timely compensate employees in violation of the KWPA; (2) Francesca's was aware of Roth's reporting of the alleged violation prior to her termination; and (3) Francesca's terminated Roth in retaliation for her complaints.[43] "However, the whistleblowing must have been done out of a good faith concern over the wrongful activity reported rather than from a corrupt motive such as

---

[38] *Rebarchek v. Farmers Coop. Elevator*, 35 P.3d 892, 898 (Kan. 2001).

[39] *See Foster*, 293 F.3d at 1194–95.

[40] *Id.* at 1195.

[41] *Id.* at 1193 n.3 (holding plaintiff to such standard at prima facie stage would pervert logic of *McDonnell Douglas* burden-shifting scheme adopted by Kansas courts; claimant's prima facie case not onerous burden).

[42] *Id.* at 1193 (if employer offers legitimate, nondiscriminatory reason for termination, burden shifts to plaintiff to show clear and convincing evidence of retaliation).

[43] *Palmer v. Brown*, 752 P.2d 685, 686 (Kan. 1988).

malice, spite, jealousy or personal gain."[44]

Francesca's challenges the third element of Roth's prima facie case—a causal connection between her protected activity and termination of her employment. The Tenth Circuit has found a causal connection exists between the protected activity and the materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[45] Courts typically consider "protected conduct closely followed by adverse action" as sufficient evidence.[46] Here, the record shows that beginning in November 2014 through February 2015, Roth complained to Newsom, Russell, and HR about wages owed to three employees in the Boutique. Roth was terminated shortly thereafter on February 26, 2015, and thus the close temporal proximity between the protected conduct and the adverse action is sufficient to justify a retaliatory motive.

Because Roth has met her prima facie case, the Court considers Francesca's stated reason for termination. As its legitimate, non-retaliatory reason for Roth's termination, Francesca states it terminated Roth after a time card audit revealed that she edited her own time in violation of Francesca's policy on eight occasions. Roth does not dispute that she violated the policy, but argues that the proffered reason is pretextual. The relevant issue is not whether the stated reasons were wise, fair, or correct but whether the defendant honestly believed in those reasons and acted in good faith.[47] In examining this issue, a court must "look at the facts as they appear to the person making the decision to terminate plaintiff."[48] The Court's role is not to second

---

[44]*Id.* at 689–90.

[45]*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[46]*Id.*

[47]*Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).

[48]*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000).

guess an employer's business judgment.[49]  The Court finds that Francesca's has met its burden and turns to the third step of its analysis.

At this step of the *McDonnell Douglas* inquiry, the burden shifts back to Roth to show that a reasonable jury could find Francesca's proffered reason for termination pretextual.  A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[50]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[51]  As noted, Francesca's maintains that Roth was discharged for editing her own time in violation of company policy.  While the Court does not quibble with whether this decision was reasonable or legitimate, there remain several reasons, taken together, why a reasonable jury might discredit Francesca's proffered explanation.

First, while Francesca's purported reason for Roth's termination has remained consistent, the same cannot be said for its statements regarding who was responsible for the decision to fire Roth.  Although Francesca's identified Newsom as the decisionmaker, she denied making the final decision to terminate Roth, speaking instead of the decision as being made "as a company."  Newsom identified Tricia Butler and Natalie Hannah as individuals who might have made the

---

[49]*Stover*, 382 F.3d at 1076.

[50]*Morgan v. Hilti*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

[51]*Kendrick*, 220 F.3d at 1230.

13

termination decision, but Francesca's did not identify Butler as a person involved in the decision to terminate Roth and Hannah testified she was not involved at all in the decision. Roth's direct supervisor Russell likewise denied involvement in the decision to fire Roth. Indeed, Russell identified Newsom and Hannah as the decision-makers. The Tenth Circuit has determined that where it is not clear who made the determination decision, a "crucial factor in the termination process, then, is left a mystery," which in turn "casts a shadow of doubt over" the employer's explanation for the termination decision.[52]

Similarly, Francesca's proffered explanations for the circumstances prompting the time card audit are inconsistent. Newsom testified she asked Hannah to conduct an audit of Roth's time cards after she visited the Boutique, a visit where Roth testified she complained to Newsom about unpaid wages. Newsom testified she requested the audit because someone likely notified her of a discrepancy with respect to Roth's time. Hannah sent the audit to Newsom, who then shared it with Russell. Russell, however, has a different recollection, and testified the audit came about after she overheard an employee at the Boutique say she would clock in from her phone, which violated company policy. Although Francesca's adopts Russell's explanation that the audit was conducted for the purpose of determining whether employees were improperly clocking in or out on their phones, Newsom's testimony suggests the audit was intended to address discrepancies in Roth's time cards. Moreover, Roth testified that Russell gave her permission to edit her own time and Francesca's does not have reason to believe that Roth, a salaried employee, was dishonest in reporting her time to reflect her actual hours worked.

Finally, Roth presents evidence that she repeatedly complained about the three employees

---

[52]*Paup v. Gear Prods., Inc.*, 327 F. App'x 100, 112 (10th Cir. 2009) (citing *Coburn v. Rockwell Automation, Inc.*, 238 F. App'x 112, 122 (6th Cir. 2007)).

going unpaid, including days before the time card audit; that the corporate office considered her hostile; that Roth often bypassed Russell to complain to Newsom; that Newsom raised the issue of Roth's complaints about unpaid employees at the February 26, 2015 termination meeting; and in her notes made afterward, Russell expressed relief that Roth had been fired. The Court finds that from this record, taken as a whole, a reasonable jury could find that Francesca's proffered reason for terminating Roth is unworthy of belief. Because Roth has cited clear and convincing evidence that reveals a genuine issue of material fact as to pretext, Francesca's is not entitled to summary judgment on Roth's claim of retaliatory discharge in violation of public policy after she complained of alleged violations of the KWPA.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 47) is **denied.**

**IT IS SO ORDERED.**

Dated: March 12, 2018

                                                S/ Julie A. Robinson
                                                JULIE A. ROBINSON
                                                CHIEF UNITED STATES DISTRICT JUDGE